IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DERICK L. MALKEMUS, | ) | CASE NO. 1:25-cv-01863-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Derick L. Malkemus ("Malkemus") seeks judicial review of the final decision of

the Commissioner of Social Security, denying his application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Malkemus's DIB be affirmed.

## II.      Procedural History

Malkemus protectively filed for DIB on February 7, 2023, alleging a disability onset date

of May 4, 2022. (Tr. 396). The claims were denied initially and on reconsideration. (Tr. 285,

294). Malkemus then requested a hearing before an ALJ. (Tr. 320). Malkemus, represented by

counsel, and a Vocational Expert ("VE") testified before an ALJ on March 4, 2024. (Tr. 254-84).

On June 13, 2024, the ALJ issued a written decision finding Malkemus not disabled. (Tr. 176-

191). The Appeals Council denied his request for review on July 7, 2025, making the hearing

decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

1

Malkemus timely filed this action on September 8, 2025. (ECF Doc. 1). On March 24, 2026, Malkemus was notified by the Commissioner that he had been determined disabled beginning June 14, 2024. (ECF Doc. 11, pp. 3-10). Malkemus filed a Notice of Award with this Court on April 6, 2026. (ECF Doc. 11). Accordingly, this Report and Recommendation will specifically address the period between May 1, 2022, the alleged onset date, and June 14, 2024, the date Malkemus became disabled according to his Notice of Award.

### III.   Evidence

#### A.   Personal, Educational, and Vocational Evidence

Malkemus was born March 10, 1991. (Tr. 396). He was 31 years old on his alleged onset date, making him a younger individual according to agency regulations. (Tr. 286). He has at least a high school education. (Tr. 189). He has past relevant work as a retail salesclerk, DOT 290.477-014, SVP 3, generally performed at the light exertional level, actually performed at the medium exertional level; and as a stock clerk, DOT 299.367-014, SVP 4, generally performed at the heavy exertional level, actually performed at the medium exertional level. (Tr. 189).

#### B.   Relevant Medical Evidence[1]

On December 13, 2022, Malkemus attended a mental health diagnostic evaluation with Debra Hoplight, CNP, of Mind, Body and Health, LLC. (Tr. 712-18). His chief complaints included worsening anxiety and depression over the past several months, affecting his "life's sense of purpose." (Tr. 712). He indicated that his symptoms included anhedonia; anxiety attacks; depression; excessive energy and worry; feelings of hopelessness, helplessness, and worthlessness; flight of ideas; grandiosity; guilt; insomnia; increased sleep; paranoia; racing

---

[1] As plaintiff raises only legal issues that pertain to his mental impairments, this discussion will be similarly limited. Any arguments concerning his physical impairments are deemed waived. See, *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).

thoughts; risky behavior/unstable relationships; and weight gain. (*Id.*). The symptoms were affecting his activities of daily living and recreational activities, his relationships, his self-esteem, and his work. (*Id.*). Malkemus claimed a diagnostic history including generalized anxiety disorder ("GAD"), depression, post-traumatic stress disorder ("PTSD"), and schizoaffective disorder – bipolar type. (Tr. 713). He reported a history of sexual and emotional abuse and noted a period roughly four years earlier where he abused heroin for six months. (*Id.*). Malkemus described a support system including his husband, his father, and his sister. (Tr. 714). CNP Hoplight diagnosed Malkemus with Schizoaffective Disorder – Bipolar Type, GAD, depression, and PTSD. (Tr. 718).

Malkemus attended an office visit with CNP Hoplight on January 10, 2023. (Tr. 739-43). He reported that he was sleeping poorly and having frequent nightmares, and his poor sleep was causing him to be irritable throughout the day. (Tr. 739). He was having frequent episodes of fluctuations in mood from anger or anxiety, to depression. (*Id.*). Malkemus indicated his overall sense of wellbeing as 4-5/10, and he was prescribed Wellbutrin and prazosin. (Tr. 741-42). At a February 7, 2023 appointment, Malkemus reported that he was continuing to have frequent nightmares, but he had experienced some improvement in his depression. (Tr. 744). He had increasing irritation and frustration, and annoyance at his online gaming friends. (*Id.*). His sense of wellbeing had improved to 5-6/10, and CNP Hoplight increased the dosage of both Wellbutrin and prazosin. (Tr. 746-47).

On March 7, 2023, Malkemus reported to CNP Hoplight that the increased dosage of Wellbutrin was helping with depression by eliminating his "extreme lows," but he was feeling more irritable and having episodes of unexplained anger. (Tr. 751). His nightmares were increasing to the point that he was trying not to go to sleep in order to avoid them. (*Id.*). At an

3

April 4, 2023 office visit, Malkemus indicated that he was having disturbing recurring memories of incidents from when he was 6-13 years old. (Tr. 755). He was discontinued on Wellbutrin due to side effects but was prescribed Caplyta. (Tr. 758). Malkemus reported slight improvement with Caplyta on June 13, 2023, noting he was less irritable, his racing thoughts were less frequent, and his symptoms, while still occurring daily, were not as drastic. (Tr. 929). His nightmares were also happening less frequently. (*Id.*).

Malkemus attended a Pre-Admission Diagnostic Mental Health Assessment on July 11, 2023 with Rebecca Feick, LSW, of the Community Counseling Center. (Tr. 849-56). He reported sexual abuse, neglect, and exposure to domestic violence in his childhood. (Tr. 851). He complained of anxiety symptoms including moodiness, irritability, anxious thoughts, nervousness, feeling overwhelmed, feeling tense/on edge, difficulty concentrating, sleep disturbance, and social anxiety – avoidance. (Tr. 853). He stated that he loses focus when in social environments and disassociates when he drives due to childhood trauma. (Tr. 854). LSW Feick diagnosed Malkemus with an unspecified anxiety disorder. (Tr. 856). At a July 24, 2023 office visit, Malkemus reported attachment issues and fear of abandonment, and noted self-worth issues and paranoia. (Tr. 857).

Malkemus met with Renee Pengov, LSW, of the Community Counseling Center on August 11, 2023, and stated that he was still having nightmares, and that he felt his medications were not helping. (Tr. 834). But at an appointment with CNP Hoplight on August 16, 2023, Malkemus reported that he has good days and bad days, but he has improved to the point that three out of four days are good. (Tr. 933). His mood swings are not as profound, though he still has some racing thoughts and irritability. (*Id.*). He does not like leaving home, but he is sleeping slightly better with fewer vivid nightmares. (*Id.*). On August 17, 2023, Malkemus again told

4

LSW Pengov that he had significant paranoia and anxiety, with self-defeating thoughts, and issues with self-worth and body image. (Tr. 840). On September 1, 2023, Malkemus reported that his paranoia and anxiety have been manageable lately, and he is taking steps to challenge his own negative feelings about himself. (Tr. 843). Nightmares had again been upsetting his sleep patterns. (*Id.*).

Malkemus had an office visit with CNP Hoplight on September 12, 2023 and reported his mood had improved slightly, though he was having some side effects from his medication. (Tr. 937). He had ongoing nightmares, and some frustration and irritability when he needs to do housework. (*Id.*). At an office visit with LSW Pengov on September 22, 2023, Malkemus reported he was sleeping better as he had been prescribed trazadone, but he still felt anxious and depressed, and like he was living in the past. (Tr. 864). On November 14, 2023, Malkemus indicated to CNP Hoplight that his racing thoughts had slowed, and his nightmares were occurring less frequently, but that he continued to internalize resentment and bitterness. (Tr. 950).

On January 4, 2024, Malkemus underwent a Behavioral Health Assessment with Signature Health. (Tr. 914-23). His presenting concerns were PTSD, depression, and anxiety, and he expressed a desire to work through his childhood trauma. (Tr. 914). Malkemus explained that it was difficult for him to interact with people outside of his house, and that has made it difficult to find and keep jobs. (Tr. 915). He reported he had been both a victim of and a witness to varying types of abuse throughout his life. (Tr. 917). He endorsed depression symptoms including sadness, guilt, hopelessness, thoughts of death, low self-esteem, loss of interest, inattention, fatigue/ no energy, irritability, lack of motivation, weight gain/increased appetite, decreased hygiene, social isolation/withdrawal; additional anxiety symptoms including

hypervigilance, uneasiness, restlessness, worry, sleep problems, panic, stomachaches, racing thoughts, avoidance, insomnia, difficulty focusing; mania symptoms including inflated self-esteem, increased goal directed activities, less need for sleep, euphoria, and more talkative; trauma symptoms including intrusive memories, flashbacks, self-blame, nightmares, angry behavior, exaggerated startle response, detachment, and difficulty experiencing positive emotions; and attachment behaviors including fearfulness and clinginess. (*Id.*). He was diagnosed with unspecified mood (affective) disorder; PTSD; GAD; and opioid use disorder, severe, in sustained remission. (Tr. 920-21). He was recommended for outpatient care. (Tr. 923).

At a January 23, 2024 office visit with CNP Hoplight, Malkemus indicated his irritability had improved over the last several months, and his nightmares were occurring less frequently. (Tr. 955). He met with Nicole Noscal, LISW, of Signature Health via video on January 31, 2024, and expressed feeling paranoid about his relationship with his husband. (Tr. 905). LISW Noscal noted that his behavior was "generally relaxed and engaged;" his speech, thought content, and perception were unremarkable; and his appearance, affect, insight, and judgment were all appropriate. (*Id.*).

A progress note by Matthew Barber, APRN-CNP, dated March 5, 2024, indicates that Malkemus has difficulty holding a job due to mental health problems, including PTSD and bipolar depression. (Tr. 134). Malkemus reported that trazadone had helped with his nightmares but left him fatigued for hours every day. (*Id.*). Malkemus stated that his anxiety left him unable to drive, although he added he drove a week ago, and his moods still varied. (*Id.*).

### C.    Medical Opinion Evidence

#### 1.    State Agency Reviewing Opinion Evidence

On June 7, 2023, state agency reviewing psychologist George Stern, Ph.D., found that Malkemus had moderate limitations in the domains of interacting with others; concentration, persistence, and maintaining pace; and adapting and managing oneself. (Tr. 289). He also opined that Malkemus had mild limitations in the domain of understanding, remembering, and applying information. (*Id.*). Dr. Stern further found that Malkemus was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extend periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 290-91). State agency reviewing psychologist Courtney Zeune, Psy.D., affirmed Dr. Stern's opinion on September 1, 2023. (Tr. 298).

#### 2.    Treating Source Opinion Evidence

CNP Hoplight completed a Mental Residual Functional Capacity Assessment on May 8, 2023. (Tr. 760-63). She indicated that Malkemus' diagnoses included anxiety, depression, PTSD, and schizoaffective disorder, bipolar type. (Tr. 760). CNP Hoplight felt that Malkemus was moderately limited in all four domains. (Tr. 761). She also indicated that Malkemus had moderate limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. (Tr. 761-63). She felt Malkemus had

7

marked limitations in his ability to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness; to travel in unfamiliar places or use public transportation; and to tolerate normal levels of stress. (*Id.*). CNP Hoplight felt Malkemus had extreme limitations in his ability to work in coordination with or proximity to others without being distracted by them; and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*).

On August 24, 2023, CNP Hoplight completed a Medical Statement Concerning Depression, Bipolar and Related Disorders form. (Tr. 826-27). CNP Hoplight diagnosed depression characterized by depressed mood, diminished interest in almost all activities; appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthless, and difficulty concentrating or thinking. (Tr. 826). She further diagnosed bipolar disorder characterized by flight of ideas, decreased need for sleep, distractibility, and involvement in activities that have a high probability of painful consequences that are not recognized. (*Id.*). CNP Hoplight opined that Malkemus had moderate limitations in the domains of understanding, remembering, and applying information, and adapting and managing oneself, and he had marked limitations in the domains of interacting with others and concentrating, persisting, and maintaining pace. (*Id.*). That same day, CNP Hoplight completed an Off-

8

Task/Absenteeism Questionnaire, indicating that she felt Malkemus would be off task at least 20 percent of the time, and absent about 4 times per month. (Tr. 827).[2]

On March 6, 2024, CNP Barber completed an Off-Task/Absenteeism Questionnaire. (Tr. 144). CNP Barber endorsed impairments including PTSD, anxiety, and chronic fatigue. (*Id.*). CNP Barber opined that Malkemus would be off-task at least 20 percent of the time, and absent about 4 times per month. (*Id.*).

### D.      Administrative Hearing Evidence

Malkemus testified before an ALJ on March 4, 2024. (Tr. 262-79). He testified that he can drive, but CNP Hoplight does not want him to because he has disassociated and zoned out while driving for the last seven or eight years. (Tr. 262). He completed the 11th grade and has not worked since May 2022. (Tr. 263). He believes he is unable to work because he deals with "an incredible amount of stress and anxiety" to the point he constantly has stomachaches. (Tr. 267). His depression, anxiety, and PTSD make it difficult for him to interact with others without becoming anxious. (*Id.*). His sleep is interrupted by nightmares, causing him to sleep whenever he can, rather than on a set schedule. (*Id.*). He stated that he has had anxiety since childhood, but it has been intensifying. (*Id.*). He has tried to address his mental health issues with medication and by seeing someone monthly for the last two years. (Tr. 267-68). He has been on the same medication for the past four or five months and has found it to be helpful. (Tr. 268).

---

[2] The Medical Statement Concerning Depression Bipolar, and Related Disorders and the Off-Task/Absenteeism Questionnaire were addressed as two separate opinions in the Plaintiff's Brief on the Merits, with the argument that it was error for the ALJ to fail to assess the Off-Task/Absenteeism Questionnaire separately. I note that the two forms were completed on the same day, were offered on forms that appear to have been provided by Malkemus' counsel, and were submitted jointly as an exhibit under a single cover letter. I therefore read the ALJ's evaluation of the "mental residual functional capacity assessment from August 24, 2023" to encompass both forms.

Malkemus further testified that he usually gets up between noon and 5:00 p.m. (*Id.*). He has trouble getting going when he wakes up because of the side effects of his medications. (Tr. 269). He is currently having nightmares three or four times weekly. (*Id.*). Malkemus does maintain relationships with some friends and indicated that he is able to get along well with his husband. (*Id.*). He showers every day and changes his clothes some days. (Tr. 269-70). He typically only leaves homes to go to the grocery store, and he enjoys reading, listening to music, and spending time with his dogs. (Tr. 270). He testified that he has not used drugs in over two years, but since he stopped his anxiety has grown worse. (*Id.*).

Under questioning by his attorney, Malkemus testified that his nightmares have been less frequent since he started his medications but he is typically groggy for hours after waking up. (Tr. 271). He typically leaves home about once per week. (*Id.*). He reported that he still sees CNP Hoplight and treats at Signature Health. (*Id.*). He typically talks to a therapist there every two weeks, though he will soon start weekly appointments. (Tr. 273). His anxiety is triggered by large groups of people and being out in public. (Tr. 274). In addition to when he drives, he disassociates when he is stressed, such as when he used to have to prepare to leave home for work. (Tr. 275). He typically struggled to get to work on time when he was employed. (*Id.*).

Once Malkemus' testimony concluded, VE Reno testified. (Tr. 279-283). VE Reno testified that Malkemus' past work included retail sales clerk, DOT 290.477-014, SVP 3, light physical demand per the DOT and medium as performed; fast food cook, DOT 313.374-010, SVP 5, medium physical demand level per the DOT and as performed; staff clerk, DOT 299.367-014, SVP 4, heavy physical demand level per the DOT, medium as performed; fast food worker, DOT 311.472-010, SVP 2, light physical demand level per the DOT, medium as performed; and

10

bus person, DOT 311.677-018, SVP 2, medium physical demand level per the DOT and as performed. (Tr. 281).

For her first hypothetical, the ALJ asked VE Reno to consider an individual of the same age, education, and work history as Malkemus, who is capable of performing work at all exertional levels, and is able to understand, remember, and carry out simple, routine, and repetitive tasks and instructions; cannot perform work requiring specific production rates, such as assembly line work; can perform work production requirements that allow flexible and goal-oriented pace; can maintain focus, persistence, concentration, pace, and attention to engage in work tasks for two hour increments per eight-hour workdays within the confines of normal work breaks and lunch periods; can deal with occasional changes in a routine work setting with changes explained in advance; could tolerate occasional brief and superficial interactions with supervisors, coworkers, and the general public, with brief meaning no sustained communication or problem solving, and superficial meaning unable to mediate, negotiate, arbitrate, confront, direct, or supervise others. (Tr. 281-82). VE Reno opined that this individual could perform Malkemus' past work as a bus person, and would also be capable of working as a warehouse worker, DOT 922.687-058, SVP 2, medium, with 48,000 jobs in the national economy; as a counter supply worker, DOT 319.687-010, SVP 2, medium, with 87,000 jobs in the national economy; and as a linen room attendant, DOT 222.387-030, SVP 2, medium, with 58,000 jobs in the national economy. (Tr. 282).

VE Reno further opined that an individual who is off task 15 percent or more of the workday would be precluded from work. (Tr. 283). Further, an employer may tolerate 1 or 2 absences during a short 30-to-60-day probationary period, but 1 absence per month on a consistent basis will result in termination. (*Id.*).

11

## IV.    The ALJ's Decision

In her decision dated June 26, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2027.

2.    The claimant has not engaged in substantial gainful activity since May 4, 2022, the amended onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following medical impairments: depressive disorder, schizoaffective type; anxiety disorder; post-traumatic stress disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is able to understand, remember and carry out simple, routine and repetitive tasks and instructions; cannot perform work requiring a specific production rate, such as assembly line work; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can deal with occasional changes in a routine work setting with changes explained in advance; could tolerate occasional, brief and superficial interactions with supervisors, coworkers and the general public and with brief meaning no sustained communication or problem-solving and superficial basis meaning is unable to mediate, negotiate, arbitrate, confront, or direct or supervise others; no tandem tasks; should not be required to resolve complaints or deal with confrontation from the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on March 10, 1991, and he was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564)

12

9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number sin the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-28).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

13

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

14

decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

The sole issue Malkemus raises for this Court's review is whether the ALJ's evaluation of CNP Hoplight's medical opinions is supported by substantial evidence. (ECF Doc. 7, p. 13). Specifically, Malkemus contends that the ALJ failed to address the critical factors of supportability and consistency when assessing these opinions, most notably CNP's Hoplight's findings concerning off-task behavior and absenteeism. (*Id.* at pp. 14-15). With regard to supportability, Malkemus argues that CNP Hoplight provided specific abnormalities underlying her determinations of off-task behavior and absenteeism, including irritability; distractibility; difficulty concentrating and maintaining focus due to flight of ideas and labile mood; and side effects of medications including drowsiness, nausea, dizziness, and increased risk of suicide. (*Id.* at p. 18) Malkemus asserts that those same abnormalities were referenced throughout her examination notes, and the ALJ's failure to address this support for CNP Hoplight's opinion amounts to reversible error. (*Id.* at pp. 19-22).

As to consistency, Malkemus argues that the ALJ mischaracterized evidence in the record when discussing this critical factor. (*Id.* at p. 23). Malkemus points to evidence in the record he believes shows that he had decompensated when under stress. (*Id.*). He also identifies instances

15

in the record of his inability to handle stress and of his increased irritability. (*Id.* at pp. 23-24). Malkemus argues that the ALJ mischaracterized his statements regarding the efficacy of his medications and inappropriately cited to treatment records predating his alleged onset date when considering consistency. (*Id.* at pp. 24-25).

The Commissioner responds that the ALJ properly addressed the factors of supportability and consistency when assessing CNP Hoplight's opinions. (ECF Doc. 8, pp. 8-13). With regard to supportability, the Commissioner argues that the extreme limitations in interactions with co-workers and peers and his ability to manage stressful situations in a work setting were unsupported by CNP Hoplight's more benign treatment notes. (*Id.* at p. 8). The Commissioner further asserts that the ALJ correctly determined that CNP Hoplight's examination notes do not support a finding that Malkemus had "decompensated," and the conservative treatment history did not provide support for marked or extreme limitations. (*Id.* at p. 9).

As to consistency, the Commissioner contends that the ALJ properly noted that the extreme limitations in CNP Hoplight's opinions are not consistent with the relatively mild treatment notes from either Community Counseling Center of Ashtabula or Signature Health. (*Id.* at p. 10). Nor were the extreme limitations suggested by CNP Hoplight consistent with findings of other providers that Malkemus was showing signs of improvement on his treatment regimen. (*Id.* at p. 11). The Commissioner argues it was consistent with the regulations for the ALJ to consider records that predated the alleged onset date when evaluating consistency, and even if it were not appropriate, it was harmless error, as it was only one of many factors the ALJ identified when articulating his findings. (*Id.*). The Commissioner believes that Malkemus' objections to the ALJ's evaluation of CNP Hoplight's opinion amounts to no more than an invitation to reweigh the evidence, an inappropriate exercise for this Court. (*Id.* at pp. 12-13).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or

17

court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82

Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of

articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination

was supported by substantial evidence." *Heather B.*, 2022 WL 3445856, at *3.

The Commissioner has the better of this argument. The ALJ articulated her assessment of

CNP Hoplight's opinions as follows:

> The undersigned is not persuaded by a mental residual functional capacity assessment from the claimant's mental health provider Debra Hoplight, PMHNP-BC, dated May 8, 2023, for the following reasons (Exh. 7F, pp. 50-53). First, although she opined that the treated effects of the claimant's mental impairments have caused him "extreme limitations in his ability to work with others without distracting them or exhibiting behavioral extremes," the undersigned finds this opinion is not supported by or consistent with the claimant's longitudinal functioning set forth in her treatment notes or counseling notes from Community Counseling Center of Ashtabula or Signature Health (Exh. 7F, pp. 50-53; but see Exhs. 7F, pp. 12, 32, 37, 43, 47; 12F; 13F; 16F; 17F; 18F). Specifically, the claimant was not receiving any documented mental health treatment for the year prior to his alleged onset date of May 4, 2022 (Exh. 1F). Upon review of Ms. Hoplight's records from December 2022 through May 8, 2023, the undersigned finds the claimant has been treated with outpatient mental health counseling and psychotropic medication (Caplyta and Prazosin) only, after she discontinued Wellbutrin because it was causing him increased irritability (Exh. 7F, pp. 50-53; but see Exhs. 7F, pp. 48, 12, 32, 37, 43, 47). Despite his onset date of May 4, 2022, the claimant's record does not establish any mental health treatment until he met with Ms. Hoplight for an initial evaluation in December 2022 (Exh. 7F). Based on monthly records from December 2022 onwards, the undersigned finds Ms. Hoplight's treatment notes do not suggest any documented observations that he had decompensated due to any stressful situations that supported her opinion that he would experience extreme limitations in stressful situations in a work setting while under her care (Exh. 7F, pp. 12, 32, 37, 43, 47-48). The undersigned finds that Ms. Hoplight determined that the claimant's increased irritability was not evidence of a worsening mental health condition, but one that she attributed to side effects from medication (Exh. 7F, p. 48). With mental health treatment since December 2022, Ms. Hoplight's longitudinal assessment of the claimant supports he has experienced moderate limitations from depression, anxiety, and irritability; and mild limitations from impulsivity (Exh. 7F, pp. 12, 32, 37, 43, 47).
>
> In a mental residual functional capacity assessment from August 24, 2023, Ms. Hoplight opined that the severity of the claimant's symptoms since December 2022 continue through the date of this decision: moderate limitations with understanding,

18

remembering and applying information; marked limitations with interacting with others; marked limitations with concentration, persistence or pace; moderate limitations with adapting and managing himself and he would be absent four or more times per month (Exh. 10F). The undersigned is not persuaded by Ms. Hoplight's opinion because it is not supported by her own outpatient treatment notes that indicate an ameliorative impact of psychotropic medication on the claimant's mental functioning (Exh. 10F; but see Exhs. 7F, pp. 12, 32, 37, 43, 47). Moreover, her opinion fails to reflect that the claimant was not receiving any mental health treatment when he first came to see her in December 2022. In fact, medical records from 2021 did not suggest any active psychological symptoms without any mental health treatment, as noted in emergency room treatment notes for his sinus infections in January 2021 (Exh. 1F, pp. 8, 9, 11). During an emergency room treatment visit on January 25, 2021, the claimant did not exhibit any active psychological symptoms, including depression, anxiety, suicidality, or homicidal ideations, and, although an outpatient medication reconciliation was not completed, there were no suggestions that he was taking or needed any psychotropic medication (Exh. 1F, pp. 8, 9, 11). As explained, the claimant has been treated with outpatient mental health counseling and psychotropic medication only since December 2022, which included a discontinuation of Wellbutrin because it was causing him increased irritability (Exh. 7F, p. 48). With treatment, longitudinal assessments of the claimant's mental functioning indicated moderate limitations from depression, anxiety, and irritability and mild limitations from impulsivity (Exhs. 7F, pp. 12, 32, 37, 43, 47; see also Exhs. 12F, pp. 1, 10; 13F, p. 5; 16F, p. 7; 17F, p. 3; 18F).

(Tr. 187-88).

With regard to the opinion dated May 8, 2023, the ALJ specifically wrote that the opinion "is not supported by . . . the claimant's longitudinal functioning set forth in her treatment notes." (Tr. 187). The ALJ noted that Malkemus was receiving only conservative treatment, including outpatient mental health counseling and psychotropic medication, and CNP Hoplight's examination attributed his irritability to side effects of medication, rather than as evidence of worsening condition that might justify such draconian limitations. (Tr. 188). The ALJ also addressed consistency, writing that the opinion is not "consistent with the claimant's longitudinal functioning set forth in . . . counseling notes from Community Counseling Center of Ashtabula or Signature Health," with citations to several records from these other providers. (Tr. 187). The

19

ALJ also wrote that the record shows no mental health treatment until December 2022, although the alleged onset date is May 4, 2022. (Tr.188).

As to the opinions dated August 24, 2023, the ALJ addressed the issue of supportability, writing that the opinion "is not supported by her own outpatient treatment notes that indicate and ameliorative impact of psychotropic medication on the claimant's mental functioning." (*Id.*). The ALJ also addressed consistency, explaining that the opinion's extreme limitations were not consistent with a complete lack of treatment for several months following the alleged onset date, and only conservative treatment thereafter. (*Id.*). The ALJ wrote that "[w]ith treatment, longitudinal assessments of the claimant's mental functioning indicated moderate limitations from depression, anxiety, and irritability and mild limitations from impulsivity," citing to several points in the record where examination notes from other providers were inconsistent with CNP Hoplight's August 24, 2023 opinion. (*Id.*).

The ALJ also contrasted CNP Hoplight's opinion with examination notes from an emergency room visit for a sinus infection over a year prior to the alleged onset date. (*Id.*). Any error relating to the ALJ's reliance on this evidence preceding the alleged onset date in her evaluation of consistency is harmless given the articulation of other substantial evidence that supports her determination. *See Garcia v. Comm'r of Soc. Sec.*, No. 1:16 CV 2682, 2018 WL 838371, at *12 (N.D. Ohio Feb 12, 2018).

I acknowledge that Malkemus cites to contrary evidence from the record, and supportive of his case for disability. This Court must, however, accord substantial deference to the ALJ's findings. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusions reached by the ALJ." *Jones,* 336 F.3d at 477. Here, the ALJ

offered substantial evidence in support of her finding that the opinions of CNP Hoplight were

unpersuasive, addressed the critical factors of supportability and consistency, and provided a

subsequent reviewer with a logical and accurate bridge in support of her reasoning. Accordingly,

the Commissioner's final decision should not be disturbed on this basis.

## VII.  Recommendation

Because the ALJ applied proper legal standards and supported her decision with

substantial evidence, I recommend the Commissioner's final decision denying Malkemus'

application for DIB be affirmed.

Dated: May 19, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party

may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C

636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the

assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of

the right to raise the issue on appeal either to the district judge or in subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report

and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)